# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 11 |
| VITAMINSPICE, | : | |
| DEBTOR. | : | BANKRUPTCY NO. 11-16200-MDC |

# MEMORANDUM

BY: MAGDELINE D. COLEMAN, UNITED STATES BANKRUPTCY JUDGE

On August 5, 2011 (the "Petition Date"), John Robison, IBT South Florida LLC, Learned J. Hand, Jehu Hand, and Esthetics World (collectively, the "Petitioning Creditors") filed an involuntary petition, under chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "Involuntary Petition"), against VitaminSpice. Thereafter, VitaminSpice filed the Motion to Dismiss the Improperly Filed Involuntary Petition and Lift the Automatic Stay Pending Adjudication of this Motion (the "Motion to Dismiss"). In the Motion to Dismiss, VitaminSpice seeks dismissal of the Involuntary Petition on the grounds that it (1) is a bad-faith filing and abuse of the bankruptcy system initiated by the Petitioning Creditors to exact payment from VitaminSpice for baseless claims, (2) was filed as a litigation tactic to frustrate pending litigation between VitaminSpice and the Petitioning Creditors, (3) had and will continue to have deleterious impacts on VitaminSpice's ongoing business.

Following several evidentiary hearings on the Motion to Dismiss and after review of voluminous documents submitted by VitaminSpice in support of the Motion to Dismiss and the Petitioning Creditors in opposition to same, the Court will grant the Motion to Dismiss. Although the Court finds that at least three of the Petitioning Creditors hold undisputed claims against VitaminSpice, dismissal is warranted because the Petitioning Creditors failed to prove that VitaminSpice is generally not paying its debts as they become due.

Consistent with Fed. R. Bankr. P. 7052, the following discussion constitutes this Court's findings

of fact and conclusions of law. This Court has jurisdiction over this core proceeding pursuant to 28

U.S.C. §§ 157 and 1334.

## STATEMENT OF FACTS[1]

### A.    The Formation of VitaminSpice

VitaminSpice is a Wyoming corporation headquartered in Chester County, Pennsylvania with a

business address of 996 Old Eagle School Road, Suite 1102, Wayne, Pennsylvania 19087. VitaminSpice

is a public company whose shares are traded on the Electronic Bulletin Board under the symbol VTMS

and is in the business of selling cooking spices enhanced with vitamins. In 2008, Edward Bukstel

("Bukstel") founded the predecessor entity to VitaminSpice, VitaminSpice, LLC. After founding

VitaminSpice, LLC, Bukstel attempted to raise capital from local investors. Finding private sources of

capital to be insufficient to develop a commercially-marketable product, Bukstel began investigating how

he could take the company public. To this end, Bukstel's former college roommate, Kevin Woodbridge

("Woodbridge") introduced Bukstel to Jehu Hand. Jehu Hand was and remains a securities attorney who

specialized in the performance of reverse mergers.

In August 2009, upon the advice of Woodbridge, Bukstel traveled to California to meet with Jehu

Hand to discuss how VitaminSpice, LLC could be taken public. As a result of their conversation, the two

determined that a reverse merger with a publicly-traded "shell company" would most effectively allow

VitaminSpice, LLC to access public capital markets. The principal reason for the adoption of this method

was that a reverse merger with a pre-existing, publicly-traded company would permit VitaminSpice, LLC

to avoid the costs of going public via an initial public offering.

In September 2009, VitaminSpice achieved its present corporate form as the result of a reverse

merger of VitaminSpice LLC with Qualsec, LLC ("Qualsec"). Jehu Hand's brother, Learned J. Hand,

---

[1] The facts set forth herein are obtained from exhibits presented at trial, trial testimony, motions and briefs of
VitaminSpice and the Petitioning Creditors. Many of the facts are not disputed by the parties, consequently, the
Court will provide specific citation to sources only where a dispute exists or such detail might be useful.

owned Qualsec. Qualsec, a limited liability company organized under the laws of the State of Wyoming, was at the time a publicly-traded shell company. The resulting entity was renamed "VitaminSpice" and is the VitaminSpice in this proceeding. At the close of the merger, Bukstel was appointed to serve as VitaminSpice's chief executive officer and chief financial officer. Jehu Hand agreed to serve as VitaminSpice's corporate counsel. In that capacity, Jehu Hand assisted VitaminSpice with, *inter alia*, identifying potential investors, the preparation of VitaminSpice's financial statements and the distribution of press releases. Existing creditors of Qualsec were given shares in the newly-formed entity. Learned J. Hand was among those receiving such shares and received 50,000 shares as a result of the transaction. Bukstel received 46,255,234 shares in the new entity.[2]

From this beginning, things quickly went south for VitaminSpice and the cast of characters involved in its business operations. During this period, it appears that substantial friction developed between Jehu Hand and Bukstel. On the one hand, Bukstel alleges that, beginning with the performance of the reverse merger, the Hands, along with other parties, engaged in a scheme to manipulate the shares of VitaminSpice and divest control of VitaminSpice from Bukstel. On the other, the Petitioning Creditors allege that Bukstel diverted corporate assets for his personal benefit and wasted corporate opportunities.

In the beginning of 2010, Jehu Hand claims to have become concerned by Bukstel's conduct when Jehu Hand noticed certain accounting irregularities during the performance of his bookkeeping role. Jehu Hand concluded that it was necessary to impose accounting procedures with VitaminSpice to prevent Bukstel from using corporate funds for personal purposes. To address his concerns, Jehu Hand traveled to Philadelphia in March 2010 to meet with Bukstel with regard to the adoption of accounting procedures necessary to comply with Securities and Exchange Commission financial reporting requirements. After traveling to Philadelphia, Jehu Hand determined that it was necessary for VitaminSpice to hire an employee to establish accounting controls. Because Bukstel and VitaminSpice did not have the funds to pay for the salary of this employee, Jehu Hand agreed to pay the salary of the

---

[2] No documents evidencing the terms of the reverse merger were submitted into evidence.

employee in the amount of $2,000.00 every two weeks.  The parties did not provide any documentary

evidence establishing the terms of this agreement including whether VitaminSpice or Bukstel agreed to

reimburse Jehu Hand for such expenses.

Around this time, Jehu Hand engaged himself in the business of preparing draft financial

statements that were presented to VitaminSpice's auditor in connection with VitaminSpice's June 30,

2010 Financial Statements ("June 2010 Statements").  As part of his efforts, Jehu Hand prepared several

documents that describe capital investments in VitaminSpice and are now part of the record before this

Court.  Among these documents is a copy of the "Notes to Unaudited Condensed Financial Statements"

dated June 30, 2010.  Trial Exh. D-11.  In this document, VitaminSpice states "In the first quarter of 2010

we sold 300,000 shares of common stock for cash of $75,000."  Although the statement does not identify

the source or sources of the $75,000, VitaminSpice's record reflects that the $75,000 investment came

from three sources – Keith Destephano, Chip Rodden and Esthetics World.   Trial Exh. D-17, Attachment

A 24.

Following Jehu Hands' completion of his work relating to the preparation of VitaminSpice's June

2010 Statements, the relationship between Jehu Hand and Bukstel completely deteriorated.  Bukstel and

Jehu Hand have leveled various accusations against each other regarding the cause for this development.

Bukstel claims that his decision to terminate Jehu Hand was the result of his discovery of an alleged stock

manipulation scheme.  On the other hand, Jehu Hand alleges that his termination was in retaliation for his

efforts to inform VitaminSpice's board of directors of Bukstel's alleged mismanagement of

VitaminSpice.  Whatever the true cause of their disagreement, it is apparent that on July 6, 2010, Bukstel

terminated Jehu Hand's relationship with VitaminSpice.

     **B.**     **The Pre-Petition Litigation**

Prior to the Petition Date, VitaminSpice, several of the Petitioning Creditors, and certain of

VitaminSpice's shareholders were litigants in various lawsuits.  These disputes centered on restrictions

placed on the sale of certain of VitaminSpice shares by Bukstel.  During 2010, Bukstel apparently issued

stop orders to Stalt, Inc., VitaminSpice's stock transfer agent, restricting the sale of shares owned by

Learned J. Hand and  Advanced Multilevel Concepts, Inc., Able Direct Marketing, Ken Nail, Esthetics

World, International Business Development, and Irv Pyun (collectively, the "Restricted Shareholders").

Bukstel contends that the stop orders were issued to prevent a stock manipulation scheme engineered by

Jehu Hand.

On March 7, 2011, Learned Hand filed a complaint against VitaminSpice in North Carolina state

court ("North Carolina Action") seeking to recover from VitaminSpice damages allegedly arising from

the stop order placed on his shares.  Thereafter, Learned Hand obtained a default judgment in the North

Carolina Action in the amount of $12,701.24 plus punitive damages in the amount of $250,000.00

("North Carolina Judgment").[3]  Subsequent to the filing of the Involuntary Petition, the North Carolina

Judgment was set aside upon motion of VitaminSpice on the grounds that the complaint initiating the

North Carolina Action was not properly served.  Learned Hand has since initiated an adversary

proceeding before this Court in which he seeks the same relief that he sought in the North Carolina

Action.

On June 8, 2011, the Restricted Shareholders filed a complaint in the United States District Court

for the Eastern District of Pennsylvania. [4] This action was captioned *Advanced Multilevel Concepts Inc.,*

*Able Direct Marketing Inc., Ken Nail, Esthetics World, International Development Business, Inc., and Irv*

*Pyun et al. v. Bukstel, VitaminSpice, Seelig, et al.,* (the "District Court Action").  The complaint named as

defendants Bukstel, VitaminSpice, and Richard Seelig.  Each of the Restricted Shareholders alleged that

he or it were a shareholder of VitaminSpice and the substance of their claims relate to damages in the

amount of $3,967,871 that they allege to have incurred as a result of their inability to convey their shares

as a result of the various stop orders placed on their shares by Bukstel.

VitaminSpice and Bukstel answered the Complaint and filed a motion to disqualify Jehu Hand as

---

[3] This judgment served as the basis for Learned J. Hand's claim as a petitioning creditor holding an undisputed
claim.  As discussed below, it appears that the Petitioning Creditors are no longer relying on this claim as
undisputed.
[4] Of the Restricted Shareholders, Esthetics World is the only party to join the Petitioning Creditors in filing the
Involuntary Petition.

counsel for the Restricted Shareholders.  In the motion to disqualify, Vitamin Spice asserted that Jehu

Hand, although not listed as attorney of record for the Restricted Shareholders, had prepared the

complaint initiating the District Court Action and his participation in the action directly through

preparation of the complaint as well as indirectly through the entities that were alleged to be his alter ego

constituted a gross violation of his ethical obligations to VitaminSpice, his former client.  VitaminSpice

further alleged that the factual allegations contained in the complaint were necessarily derived from

confidential information learned by Jehu Hand while acting in his capacity as counsel for VitaminSpice.

On August 5, 2011, the same day that the Petitioning Creditors filed the Involuntary Petition, the

Restricted Shareholders filed their response to the motion to disqualify Jehu Hand.  In their response, the

Restricted Shareholders denied that Jehu Hand prepared their complaint.  However, they admitted that

Jehu Hand reviewed the complaint prior to its filing.  In the alternative, the Restricted Shareholders

contended that Jehu Hand's representation of VitaminSpice did not overlap with the matters implicated by

the District Court Action and therefore these was no risk that his involvement with the Restricted

Shareholders would cause him to disclose confidential information learned in his capacity as

VitaminSpice's counsel.

On September 13, 2011, the District Court transferred the District Court Action to the civil

suspense file.  The District Court took no action on the motion to disqualify prior to placing of the action

in the civil suspense file.  Subsequent to the filing of the Involuntary Petition, the Restricted Shareholders

filed with this Court a notice of removal dated September 2, 2011, seeking removal of the District Court

Action to this Court.

### C.    The Involuntary Bankruptcy

The Petitioning Creditors filed the Involuntary Petition on August 5, 2011.  The Petitioning

Creditors are comprised of five creditors including individuals and entities: John Robison ("Robison"),

South Florida LLC ("IBT"), Learned J. Hand, Jehu Hand, and Esthetics World.  Robison, an individual,

claims he is owed $58,000 representing amounts due pursuant to an unpaid promissory note.  IBT, a

corporation, states the amount of its claim is $38,500 and is derived from amounts due pursuant to an

unpaid promissory note. Learned J. Hand states the amount of his claim is $262,701.24 and is based upon an unpaid judgment. Jehu Hand states the amount of his claim is $26,151.20 and is derived from amounts due as a result of unreimbursed expenses. Finally, Esthetics World, a corporation, states the amount of its claim to be $30,000 and the nature of its claim to be cash on deposit.

In response to the Involuntary Petition, VitaminSpice filed the Motion to Dismiss that is the subject of this decision. In the Motion to Dismiss, VitaminSpice presses three arguments in favor of dismissal of the Involuntary Petition. First, VitaminSpice argues that the Involuntary Petition was filed in bad faith. Specifically, VitaminSpice argues that Jehu Hand engineered the filing of the Involuntary Petition for the purpose of gaining tactical advantage with regard to the District Court Action, the North Carolina Action, and litigation pending in the Chester County Court of Common Pleas commenced by Robison. With regard to the District Court Action, VitaminSpice argues that Jehu Hand and Esthetics World joined the Involuntary Petition for the purpose of preventing the District Court from considering VitaminSpice's claims arising from Jehu Hand's alleged breach of his professional obligations. With regard to the North Carolina Action, VitaminSpice argues that Learned J. Hand joined the Involuntary Petition for the purpose of preventing VitaminSpice from vacating an improperly obtained default judgment. The Motion to Dismiss does not allege that Robison or IBT were motivated by improper purposes. Rather, VitaminSpice argues that Robison or IBT were recruited by Jehu Hand for the purpose of achieving his and his brother's improper purposes. Second, VitaminSpice argues that the Petitioning Creditors lack standing to file the Involuntary Petition because their claims are subject to bona fide disputes. Third, VitaminSpice argues that the Involuntary Petition should be dismissed because its filing has harmed and will continue to harm VitaminSpice's business operations. In addition to dismissal, VitaminSpice has requested that it be awarded fees and costs pursuant to 11 U.S.C. §303(i)(1) and (2).

On September 18, 2011, the Petitioning Creditors filed their opposition to the Motion to Dismiss (the "Opposition"). In the Opposition, the Petitioning Creditors argue that the Petitioning Creditors have presented *prima facie* evidence sufficient to show that the claims held by "all 4 petitioners" are valid and not subject to bona fide dispute. With regard to VitaminSpice's argument that the Petitioning Creditors

filed the Involuntary Petition in bad faith, the Petitioning Creditors argue that they are entitled to a

presumption of good faith and that VitaminSpice has not put forth sufficient evidence to rebut that

presumption. The Opposition contains no discussion of whether VitaminSpice is generally not paying its

debts as they become due or VitaminSpice's request for fees and costs pursuant to 11 U.S.C. §303(i)(1)

and (2).

Shortly after the Petition Date, the Petitioning Creditors filed a Motion for Appointment of a

Trustee ("Trustee Motion"). In the Trustee Motion, the Petitioning Creditors request the appointment of

an interim trustee pursuant to 11 U.S.C. §1104(a)(1). The Petitioning Creditors assert that a trustee is

required to protect VitaminSpice's assets and properly operate the Company because of financial

improprieties committed by Bukstel relating to his use of VitaminSpice's corporate funds as well as his

alleged personal infirmities. The Court denied the Trustee Motion without prejudice. The Petitioning

Creditors filed a Second Motion for Appointment of a trustee ("Second Trustee Motion") setting forth

almost identical claims as those in the Trustee Motion. That matter remains pending before this Court.

## DISCUSSION

In determining whether the filing of an involuntary petition is valid and as a condition to the entry

of any order of relief, a bankruptcy court must determine whether the petitioning creditors have standing

and whether the putative debtor is not paying its debts as they become due. 11 U.S.C. §§ 303(b),

303(h)(1); *B.D.W. Assocs., Inc. v. Busy Beaver Bldg. Ctrs., Inc.*, 865 F.2d 65, 66 (3d Cir. 1989)

(recognizing bankruptcy court is required to determine whether claims of petitioning creditors are subject

to a bona fide dispute); *Bartmann v. Maverick Tube Corp.*, 853 F.2d 1540 (10th Cir. 1988); *In re Law

Center*, 261 B.R. 607, 609-10 (Bankr. M.D. Pa. 2001). In addition, a bankruptcy court may also consider

whether the petitioning creditors filed the involuntary petition in good faith. *Shinko v. Miele*, 29 Fed.

Appx. 890, 891 (3d Cir. 2002) (recognizing that bankruptcy court was justified in dismissing involuntary

petition because petition was filed in bad faith).

I.    **Standing of the Petitioning Creditors, §303(b)(1)**

As an initial matter, the Court must consider whether the Petitioning Creditors have standing to

file the Involuntary Petition. To determine whether the Petitioning Creditors have standing, this Court

must determine whether the Petitioning Creditors are the holders of bona fide claims against

VitaminSpice. *B.D.W. Associates, Inc.*, 865 F.2d at 66 (recognizing that if a creditor's claim is subject to

a bona fide dispute, that creditor lacks standing to file an involuntary petition). *Landon v. Hunt*, 977 F.2d

829, 832 (3d Cir. 1992) ("The Bankruptcy Code clearly states that an involuntary proceeding can *only* be

filed by creditors who hold claims that are not contingent as to liability or subject to a bona fide dispute)

(emphasis in original); *In re Tama Manufacturing Co., Inc.*, 436 B.R. 763, 768 (Bankr. E.D. Pa. 2010)

(same).

Pursuant to 11 U.S.C. § 303(b)(1), a petitioning creditor does not have standing if its debt is

subject to a bona fide dispute. As a result of the 2005 amendments to the Bankruptcy Code, a dispute as

to liability *or amount* is sufficient to render a creditors claim subject to a bona fide dispute. *In re Euro–*

*American Lodging Corp.*, 357 B.R. 700, 712 n. 8 (Bankr. S.D.N.Y. 2007) (stating that as a result of the

2005 amendments "any dispute regarding the amount that arises from the same transaction and is directly

related to the underlying claim should render the claim subject to a *bona fide* dispute."); *In re Mountain*

*Dairies, Inc.*, 372 B.R. 623, 633 (Bankr. S.D.N.Y. 2007) (stating "That a claim could have been filed in

good faith when a substantial portion of that claim was the subject of a dispute on its face is untenable").

As such, the Petitioning Creditors have standing to file the Involuntary Petition, only if they are the

holders of "a claim against [VitaminSpice] that is not contingent as to liability or the subject of a bona

fide dispute as to liability or amount." *Landon*, 977 F.2d at 832 (recognizing "an involuntary proceeding

can only be filed by creditors who hold claims that are not contingent as to liability or subject to a bona

fide dispute").

In a process similar to proof of claim litigation, the Petitioning Creditors bear the burden of

providing *prima facie* evidence that their claims are not subject to a bona fide dispute. Once the

petitioning creditors meet their *prima facie* burden, VitaminSpice bears the burden of establishing that a

bona fide dispute does exist with regard to the petitioning creditors' claims. *Bartmann*, 853 F.2d at 1543–

44 (discussing burden shifting standard with regard to a creditor's standing to file an involuntary

9

petition); *In re Dilley*, 339 B.R. 1, 6 (B.A.P. 1st Cir. 2006) (discussing shifting burdens); *Mountain Dairies, Inc.*, 372 B.R. at 633 ("the petitioning creditor must first establish a *prima facie* case that no bona fide dispute exists"); *In re Mylotte, David & Fitzpatrick*, Bky. No. 07-11861, 2007 WL 2033812, at \*6 (Bankr. E.D. Pa. Jul. 12, 2007) (same). Ultimately, whether a petitioning creditor's claim is the subject of a bona fide dispute is determined by whether "there is a genuine issue of a material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts." *B.D.W. Assoc, Inc.*, 865 F.2d at 65; *Tama Manufacturing Co.*, 436 B.R. at 768 (applying *Busy Beaver* standard); *In re Graber*, 319 B.R. 374, 377 (Bankr. E.D. Pa. 2004) ("A claim is in bona fide dispute if there is a substantial issue of material fact that bears on the debtor's liability, or a substantial contention as to the application of law to the facts.").

If VitaminSpice has twelve or more creditors, an involuntary petition may be initiated by the filing of an involuntary petition by three or more creditors that are holders of claims not subject to a bona fide dispute. 11 U.S.C. § 303(b)(1). Alternatively, if VitaminSpice has less than twelve creditors, an involuntary petition may be initiated by one creditor holding a claim not less than $14,425 and not subject to a bona fide dispute. 11 U.S.C. § 303(b)(2). Here, the parties do not contest whether VitaminSpice has more than twelve creditors.[5] For this reason, this Court will assume that VitaminSpice does in fact have more than twelve creditors and will evaluate whether at least three of the Petitioning Creditors are holders of claims not subject to a bona fide dispute.

**The Claims**

This Court will now consider the claims of the Petitioning Creditors to determine whether, as of the filing of the Involuntary Petition, each held a bona fide claim. However, the Court will not perform

---

[5] This Court notes that the Petitioning Creditors have the burden of coming forward with evidence as to the number of the Alleged Debtor's creditors. *In re Express Car & Truck Rental, Inc.*, 440 B.R. 422, 434 (Bankr. E.D. Pa. 2010) (determining that petitioning creditor failed to undertake any inquiry as to whether alleged debtor had more than twelve creditors); *In re Stewart*, Bky. No. 07-11414, 2008 WL 4526130, at \*10-11 (Bankr. E.D. Va. Sept. 30, 2008) (awarding alleged debtor attorneys' fees and costs resulting from an involuntary petition filed by a creditor who had failed to perform reasonable diligence with regard to whether the alleged debtor had fewer than twelve creditors); *In re Silverman*, 230 B.R. 46, 53 (Bankr. D.N.J. 1998) (finding that petitioning creditor failed to use reasonable diligence in investigating whether the debtor had more than twelve creditors).

an analysis of Learned J. Hand's claim because it appears that the Petitioning Creditors, as set forth in

their Opposition, do not rely on this claim in support of whether at least three of the Petitioning

Creditors' claims are not subject to a bona fide dispute. The Court's analysis of the four remaining

Petitioning Creditors' claims follows.[6]

### A.      John Robison's Claim

This Court heard the testimony of Robison at the hearing on October 21, 2011 (the "October 21

Hearing"). Robison contended that he is the holder of a claim against VitaminSpice as a result of a

$50,000 loan made to VitaminSpice. In support of his claim, Robison offered and the Petitioning

Creditors submitted into evidence a Bridge Loan Agreement dated March 19, 2010 (the "Bridge Loan

Agreement") and a Promissory Note dated March 2010 in the amount of $50,000 (the "Robison Note").

Pursuant to the terms of the Bridge Loan Agreement, VitaminSpice was to issue to Robison 25,000 shares

of common stock in exchange for each $25,000 loaned. The Bridge Loan Agreement further provided

that the Robison Note was to be repaid on or before September 19, 2010. Both the Bridge Loan

Agreement and the Robison Note appear to bear the signature of Bukstel who signed on behalf of

VitaminSpice.

Robison testified that he had provided a $50,000 check to Woodbridge, Bukstel's former college

roommate and the party who introduced Robison to VitaminSpice, with the expectation that the check

would be delivered to Jehu Hand by Woodbridge.[7] Robison further testified that he understood Jehu

Hand's role in VitaminSpice's operations was to manage VitaminSpice's books and handle its financial

transactions. Robison had no direct contact with Jehu Hand during the course of the transaction.

In addition to the written documentation evidencing Robison's claim, the Petitioning Creditors

---

[6] In reviewing and analyzing the Petitioning Creditors' claims, the Court gave little, if any, consideration to the testimony of either Jehu Hand or Bukstel. The testimony of both parties was not credible and often conflicted with both the documentary evidence and their express statements contained in the written record. For this reason, when necessary, this Court relied almost exclusively on the documentary evidence to determine whether a bona fide dispute exists with regard to any of the Petitioning Creditors' claims.

[7] At the time Robison delivered the check, Robison was aware that Woodbridge had been convicted for securities fraud.

identified a wire transfer from Jehu Hand's trust account received by VitaminSpice on March 22, 2010, in

the amount of $40,000 as evidence that VitaminSpice did in fact receive a loan from Robison.  The

Petitioning Creditors explain that the $10,000 difference between the $50,000 loan and the amount of the

wire transfer is attributable to a $5,000 finder's fee paid to Woodbridge, the party who introduced

Robison to VitaminSpice, and $5,000 unilaterally withheld by Jehu Hand as reimbursement of certain

payments made by him on behalf of VitaminSpice.

The Petitioning Creditors also rely on electronic mail ("email") correspondence, including an

email dated September 19, 2010, in which Bukstel acknowledges receipt by VitaminSpice of the proceeds

of the Robison Note.  Trial Exh. C-2.  In the same email, Bukstel offers to authorize the issuance of

100,000 shares to Robison to compensate him for the original unissued 50,000 shares and for any

additional damages Robison may have incurred as a result of VitaminSpice's failure to comply with its

obligations under the Bridge Loan Agreement and the Robison Note.

Robison testified that to collect the amounts due pursuant to the loan he contacted Woodbridge

and other parties involved in VitaminSpice's operations.  During this time, Robison was issued a share

certificate evidencing his ownership of the shares that were to be delivered pursuant to the Bridge Loan

Agreement.  However, the certificate had a stop order on it that prevented Robison from conveying his

shares.  Based on his conversations with VitaminSpice's representative, Robison testified that he became

increasingly skeptical of VitaminSpice's intent to honor its obligations under the Bridge Loan Agreement

and the Robison Note.  Ultimately, Robison filed on November 5, 2010, a lawsuit in Chester County

Court of Common Pleas, Docket No. 10-13170 against VitaminSpice, Bukstel, Richard Seelig,[8] and

William Fields (the "Robison Litigation").  The purpose of this lawsuit was to recover the amounts due

pursuant to the Bridge Loan Agreement and the Robison Note.  VitaminSpice filed its answer and

affirmative defenses on January 21, 2011.  This lawsuit remained pending as of the Petition Date.  In his

testimony, Robison acknowledged that VitaminSpice has contested the amount due pursuant to the

---

[8] Richard Seelig appears to be a shareholder and director of the VitaminSpice who was responsible for providing
clinical trials of the VitaminSpice's products.

Robison Note in the state court proceeding.

In response to the Petitioning Creditors evidence of VitaminSpice's obligations to Robison, VitaminSpice argues that the Robison claim is not bona fide because it is the subject of the pending Robison Litigation.[9]  VitaminSpice does not dispute that both the alleged loan from Robison was not repaid and the 50,000 shares of common stock were not issued when due on September 18, 2010.  Rather, VitaminSpice argues that it was not obligated to repay the loan or issue the shares because Robison's claim is "a trumped-up and phony debt, nowhere near bona fide and is hotly contested in a separate case pending in Pennsylvania state court."  In support of its position, VitaminSpice relies exclusively on the testimony of Bukstel who alleges that his signatures on both Bridge Loan Agreement and the Promissory Note were forged.  In addition, VitaminSpice claims that the $40,000 received cannot be attributed to any loan made by Robison because the wire transfer transmitting these funds to VitaminSpice came from Jehu Hand's client-trust account.  Alternatively, VitaminSpice relied on the testimony of Bukstel as well as email correspondence between Bukstel and Robison dated September 19, 2010 (Trial Exhibit C-2) to argue that despite the bank records evidencing receipt of the wire transfer, VitaminSpice never actually received the proceeds of the Robison loan.  Instead, Bukstel claims that the proceeds of the Robison loan were diverted by Jehu Hand.

Based on this Court's review of the evidence regarding the Robison claim, including copies of the agreements setting forth the terms of VitaminSpice's obligations to Robison, evidence that Robison fulfilled the contractual prerequisites to his claim, and VitaminSpice's records acknowledging the loan as a valid liability (Trial Exh. C-12), this Court finds that the Petitioning Creditors have established that Robison holds a bona fide claim against VitaminSpice.  VitaminSpice's unsupported denials of liability, including Bukstel's claim that his signatures on the loan documents were forged, are insufficient to rebut their prima facie validity. *Dilley*, 339 B.R. at 7 (a mere denial "is not sufficient under § 303 or under Fed. R. Civ. P. 56(e), made applicable by Fed. R. Bankr. P. 7056, to counter the [petitioning creditors'] prima

---

[9] For whatever reasons, the parties have not provided to this Court copies of the pleadings filed in the Robison Litigation.

facie claims."); *In re Paper I Partners, L.P.*, 283 B.R. 661, 676 (Bankr. S.D. N.Y. 2002) ("It was not the intention of Congress that a debtor be able to avoid bankruptcy by merely disputing the existence or amount of a claim."). With regard to the significance of the pending Robison Litigation, this Court notes that the mere existence of litigation relating to a petitioning creditor's claim is insufficient to rebut its prima facie validity. *In re Red Rock Rig 101, Ltd.*, 397 B.R. 545 (10th Cir. BAP 2008) ("The mere existence of pending litigation is insufficient to establish the existence of a bona fide dispute.").

### B.    IBT South Florida LLC's Claim

IBT asserts a claim against VitaminSpice in the amount of $35,000 for an unpaid loan made on March 17, 2010. IBT is a Florida limited liability company managed by Ray Suprenard ("Suprenard"). The Petitioning Creditors submitted an affidavit from Suprenard in support of IBT's claim. In his affidavit, Suprenard stated that he was introduced to Bukstel in November 2009 at which time Suprenard learned that VitaminSpice was soliciting investments to finance its operations. Suprenard claimed that Jehu Hand provided him a draft promissory note evidencing his proposed investment. After making revisions to the proposed note, Suprenard claimed that he forwarded a copy to Jehu Hand and informed him that upon receipt of a copy of the note signed by Bukstel, Suprenard would wire to Jehu Hand's trust account his $35,000 investment. Suprenard further stated that on March 19, 2010, he received a signed copy of the IBT Note at which point he wired $31,500 to Jehu Hand's trust account and paid $3,500 to Tom Jeter as a finders' fee. The terms of the IBT Note state that repayment of the loan was due on June 9, 2010. In addition, the terms of the IBT Note call for VitaminSpice to have issued 35,000 shares of common stock to IBT as further consideration for the loan. The Petitioning Creditors allege that VitaminSpice failed to either repay the IBT Note or issue the 35,000 shares of common stock to IBT.

In further support of the IBT claim, the Petitioning Creditors submitted a Promissory Note dated March 11, 2010, in the amount of $35,000 (the "IBT Note"). The Petitioning Creditors claim that Bukstel signed the IBT Note on behalf of VitaminSpice on March 16, 2010. In addition to the written documentation evidencing IBT's claim, the Petitioning Creditors identified a wire transfer from Jehu Hand's trust account to VitaminSpice's corporate account on or about March 18, 2010, in the amount of

14

$28,970 as evidence that VitaminSpice did in fact receive a loan from IBT. Trial Exh. C-12.

In response to the Petitioning Creditors evidence of VitaminSpice's obligations to IBT, VitaminSpice does not dispute that the alleged loan from IBT was not repaid on June 9, 2010, when it came due or that the 35,000 shares of common stock were not issued. As with the documents evidencing Robison's claim, Bukstel alleges that the signature appearing on the IBT Note is not his and is a forgery. In addition, VitaminSpice claims that the $30,000 received cannot be attributed to any loan made by Robison because the wire transfer transmitting these funds to VitaminSpice came from Jehu Hand's client-trust account. On this basis, VitaminSpice argues that the fact that the wire transfer came from Jehu Hand's trust account rather than directly from IBT is evidence of Jehu Hand's scheme to cause VitaminSpice to incur bogus debts that the Petitioning Creditors now rely upon to file their Involuntary Petition.

The record before this Court indicates the existence of a written agreement evidencing a loan with its attending terms between VitaminSpice and IBT. In addition, the evidence establishes that IBT fulfilled the contractual prerequisites to its claims. VitaminSpice's internal documents, reflect that VitaminSpice recognized its obligation to IBT. VitaminSpice's General Ledger as of March 31, 2010 (the "General Ledger") accounted for and recognized VitaminSpice's debts to IBT. Trial Exh. C-12. In addition, in an email dated May 19, 2010, Bukstel acknowledged receipt of $30,000.00 from Suprenard.

VitaminSpice's unsupported denials of liability, including Bukstel's claim that his signatures on the loan documents were forged, like the opposition to Robison's claim, are insufficient to rebut its prima facie validity. *Dilley*, 339 B.R. at 7 (a mere denial "is not sufficient under § 303 or under Fed. R. Civ. P. 56(e), made applicable by Fed. R. Bankr. P. 7056, to counter the [petitioning creditors'] prima facie claims."); *Paper I Partners*, 283 B.R. at 676 ("It was not the intention of Congress that a debtor be able to avoid bankruptcy by merely disputing the existence or amount of a claim."). Accordingly, this Court finds that VitaminSpice has failed to rebut the prima facie evidence that IBT is the holder of a bona fide claim against VitaminSpice.

C.    **Jehu Hand's Claim**

Jehu Hand asserts a claim against VitaminSpice in the amount of $23,119.20 for unreimbursed expenditures he made in connection with service performed on behalf of VitaminSpice and for which he claims VitaminSpice was obligated to reimburse him. The Petitioning Creditors offered the testimony of Jehu Hand and invoices relating to the alleged expenditures in support of this claim. Jehu Hand testified that VitaminSpice's obligation to reimburse him for the expenditures is not based upon any written agreement. Jehu Hand testified that there is no written document evidencing the terms and conditions of VitaminSpice's repayment of expenditures. Jehu Hand rejected any claim by VitaminSpice that a retainer agreement dated June 2, 2009 between Jehu Hand's law firm and VitaminSpice governed the claim at issue. Jehu Hand testified that the retainer agreement is an unenforceable agreement because it was never executed by a representative of VitaminSpice. Jehu Hand testified that, as such, VitaminSpice's obligation to reimburse him for the expenditures is based upon "mutual expectation that the funds would be paid." Jehu Hand further maintained that he functioned not as VitaminSpice's attorney, but as its bookkeeper. Jehu Hand claims to have devoted 80% of his time to working as a controller or bookkeeper for VitaminSpice. He attributes his other time to the review of board minutes and press releases. Bukstel alleges that Jehu Hand was retained as counsel by VitaminSpice.

Whatever Jehu Hand's role at VitaminSpice, the Court finds that the Petitioning Creditors failed to establish that he has a bona fide undisputed claim against VitaminSpice. While the Petitioning Creditors have presented evidence sufficient to establish that Jehu Hand did in fact make certain expenditures that appear to have been on behalf of VitaminSpice, the Petitioning Creditors failed to identify from what evidence, other than Jehu Hand's unsupported testimony, this "mutual expectation" may be inferred. The Petitioning Creditors failed to submit any documents or correspondence between Jehu Hand and any representative of VitaminSpice containing any affirmative statement evidencing a "mutual expectation" that these expenditures would be reimbursed. The Petitioning Creditors have failed to present any evidence that establishes that VitaminSpice is under any obligation to reimburse Jehu Hand for these expenditures, or that such debts, even if owed, are presently due and owing. Consequently, this

16

Court must find that the Petitioning Creditors have failed to meet their prima facie burden of establishing that Jehu Hand's claim is not subject to a bona fide dispute.

**D.    Esthetics World's Claim**

Esthetics World appears to be an entity with a principal place of business located at 1005 Country Club Drive, Cheyenne, Wyoming. Jehu Hand admits that he is counsel for Esthetics World and that the company is involved in the import and export of beauty supplies. According to VitaminSpice's share transfer records maintained by Stalt, Esthetics World holds at least four separate share certificates evidencing ownerships of a total of 3,037,180 shares of VitaminSpice's common stock. Jehu Hand explained that Esthetics World's interests arose from certain debts owed by Qualsec that were converted to equity upon the completion of the reverse merger.

As for the claim relied upon by Esthetics World in connection with the filing of the Involuntary Petition, the Petitioning Creditors allege that the claim held by Esthetics World derives from a subsequent direct payment in the amount of $30,000 made by Esthetics World to VitaminSpice in exchange for the issuance of 120,000 shares in VitaminSpice. In support of this claim, the Petitioning Creditors provided evidence of a wire transfer in the amount of $30,000 received by VitaminSpice on February 16, 2010. The evidence consists of two account statements, one from the account originating the transfer and the other from the account receiving the transfer, and a copy of VitaminSpice's General Ledger. These three documents show that VitaminSpice received on February 16, 2010 a transfer in the amount of $30,000 from a bank account in the name Esthetics World. Trial Exh. D-11, Attachments 16, 17.

In addition, the Petitioning Creditors rely on the "Notes to Unaudited Condensed Financial Statements" dated June 30, 2010, to establish that VitaminSpice acknowledge receipt of the investment and its obligation to issue the shares at issue. Trial Exh. D-11, Attachment 18. In this document, VitaminSpice states "In the first quarter of 2010 we sold 300,000 shares of common stock for cash of $75,000." Although the statement does not identify the source or sources of the $75,000, other documents in the record indicate that the $75,000 investment came from three sources – Keith Destephano in the amount of $30,000 for 120,000 shares, Chip Rodden in the amount of $15,000 for

60,000 shares, and Esthetics World in the amount of $30,000 for 120,000 shares. Trial Exh. D-11,

Attachment 24, General Ledger, p. 3.

On the basis of this evidence, this Court finds that the Petitioning Creditors have met their initial

burden with regard to the claim asserted by Esthetics World. VitaminSpice's own records establish that it

received from Esthetics World the $30,000 investment and that it was obligated to issue 120,000 shares in

consideration of this investment. Finding that the Petitioning Creditors met their initial burden with

regard to whether Esthetics World holds a bona fide claim, this Court must now determine whether the

Debtor has established that a bona fide dispute does exist with regard to Esthetics World's claim.

In response to the Petitioning Creditors' allegations, VitaminSpice admits that it received the

$30,000 payment from Esthetics World. However, VitaminSpice denies that receipt of this payment

caused it to incur any repayment obligation. VitaminSpice claims that Jehu Hand is the real party in

interest because the payment came from Jehu Hand's trust account and constitutes payment of Jehu

Hand's obligations due to VitaminSpice pursuant to the terms of the reverse merger between Qualsec and

VitaminSpice, LLC. Bukstel claims to be in possession of certain documents "showing [Esthetic

World's] bogus addresses, shareholders, and offers, as well as additional documents (including forgeries

by [Jehu Hand] showing [Jehu Hand's] control over [Esthetics World] and [Esthetic World's]

VitaminSpice stock." Trial Exh. D-14. However, this Court has not been provided with documents that

establish Jehu Hand controls Esthetics World or otherwise establishes that Esthetic World is his alter ego.

Bukstel's subjective belief that Jehu Hand controls Esthetics World is insufficient to establish that a bone

fide dispute exists. *IBM Credit Corp. v. Compuhouse Systems, Inc.*, 179 B.R. 474, 479-80 (W.D. Pa.

1995) (refusing to credit alter ego theory to establish claims were subject to bona fide dispute where

evidence that consisted of nothing more than "subjective belief"). Because an unsupported denial is not

sufficient to create a bona fide dispute, this Court finds that Bukstel's allegations in this regard are

insufficient to establish that Esthetics World's claim is subject to a bona fide dispute.

Finding that IBT, Robison and Esthetics World are each in possession of a bona fide claim, this

Court finds that at least three of the Petitioning Creditors had standing to file the Petition.

18

**II.    Whether VitaminSpice is Generally Not Paying its Debts as they Become Due, §303(h)(1)**

VitaminSpice has not challenged or disputed that it is not paying its debt. However, as required by § 303(h)(1), a finding by this Court that VitaminSpice is generally not paying its debts as such debts become due is a prerequisite to the entry of any order of relief. *Paradise Hotel Corp. v. Bank of Nova Scotia*, 842 F.2d 47, 51 (3d Cir. 1988) (recognizing that petitioning creditor must produce evidence establishing debtor was not paying its debts as such debts become due); *In re Miller*, 444 B.R. 446 (Bankr. N.D. Okla. 2011) (before a bankruptcy court may enter an order for relief in an involuntary proceeding, it must find that "the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount[.]"); *In re Food Gallery at Valleybrook*, 222 B.R. 480, 486 (Bankr. W.D. Pa. 1998) (recognizing bankruptcy court may not enter involuntary relief unless the debtor is generally not paying its debts as such debts become due); *In re Brooklyn Res. Recovery, Inc.*, 216 B.R. 470, 481 (Bankr. E.D.N.Y. 1997) (holding that a bankruptcy court may only grant involuntary relief if the petitioning creditors show that debtor is not paying its debts as they become due).

Courts considering whether a debtor is generally not paying its debts consider several factors including the number of debts, the amount of delinquency, the materiality of nonpayment and the nature of the debtor's conduct of its financial affairs. *Express Car & Truck Rental,* 440 B.R. at 434 (listing factors relating to "the 'generally not paying' standard in § 303(h)(1)"); *Food Gallery at Valleybrook*, 222 B.R. at 486-87 (listing factors); *Brooklyn Resource Recovery, Inc.*, 216 B.R. at 481 (listing factors). The burden is on the petitioning creditors to establish by a preponderance of the evidence that the debtor was generally not paying its debts as they became due as of the petition date. *Bartmann*, 853 F.2d at 1546; *In re Petro Fill, Inc.*, 144 B.R. 26, 30 (Bankr. W.D. Pa. 1992); *In re Better Care, Ltd.*, 97 B.R. 405 (Bankr. N.D. Ill. 1989) (addressing whether petitioning creditors produced sufficient evidence to show debtor was generally not paying its debts).

Here, to meet their burden with regard to whether VitaminSpice is generally not paying its debts, Petitioning Creditors were required to present evidence of VitaminSpice's total debt and what amount of

that debt is delinquent. *See, e.g., In re Spivey*, Bky. No. 10-50340, 2010 WL 5476754, at *1 (Bankr. S.D.

Ga. Dec. 17, 2010) (recognizing that at trial petitioning creditors presented evidence as to Debtor's total

debt and the percentage unpaid); *In re Smith*, 415 B.R. 222, 231 (Bankr. N.D. Tex. 2009) (recognizing

that facts presented at hearing showed debtor "is not paying ninety-nine percent of his debts in aggregate

amount"). Despite bearing the burden of establishing by a preponderance of the evidence that

VitaminSpice is not paying its debts as such debts become due, the Petitioning Creditors have failed to

provide sufficient evidence with regard to the issue. The only evidence submitted to this Court relating to

whether VitaminSpice is generally not paying its debts as they become due relates to whether

VitaminSpice has failed to pay the specific debts relied upon by the Petitioning Creditors. The

Petitioning Creditors have provided no evidence with regard to VitaminSpice's other creditors or the total

amount of debt owed to them, let alone whether VitaminSpice's debts owed to such creditors are

delinquent. Simply stated, the record contains no evidence with regard to the total number of

VitaminSpice's debts, the total amount of delinquency and the materiality of any delinquency.

The Petitioning Creditors have presented some evidence relating to VitaminSpice's conduct of its

financial affairs. Such evidence relates exclusively to the Petitioning Creditors' claim that Bukstel is

misappropriating corporate resources for his personal benefit. However, the record contains no evidence

from which this Court may infer that to the extent Bukstel is misappropriating corporate resources his

conduct is causing the nonpayment of VitaminSpice's debts. From this record, this Court is without any

basis to infer whether the debts this Court has found to be not subject to a bona fide dispute constitute a

substantial percentage of VitaminSpice's overall obligations. For this reason, this Court finds the present

record to be insufficient to establish that VitaminSpice is generally not paying its debts as they become

due.

The failure of the Petitioning Creditors to present direct evidence as to VitaminSpice's overall

financial obligations is without excuse. It is not this Court's role to act as a forensic accountant to piece

together from a helter skelter record evidence of VitaminSpice's overall financial condition. *See, e.g.,*

*Down v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003 (9th Cir. 2000) ("it behooves parties to treat

[judges] not as if we were pigs sniffing for truffles"); *Guarino v. Brookfield Township Trs.*, 980 F.2d 399, 405-06 (6th Cir. 1992) ("Nothing in either the rules or case law supports an argument that the trial court must conduct its own probing investigation of the record.... What concept of judicial economy is served when judges ... are required to do the work of a party's attorney?"). Three of the five Petitioning Creditors were involved in litigation pending for some time in other courts prior to the Petition Date. By his own admission, Jehu Hand served as VitaminSpice's bookkeeper. The Petitioning Creditors should have been able to provide some information with regard to this issue. Their failure to present any evidence with regard to a necessary condition to their right to involuntary relief mandates dismissal of the Petition. *In re Aminian*, Bky. No. 07-12957, 2008 WL 793574, at *1 (Bankr. S.D.N.Y. Mar. 25, 2008) (recognizing that dismissal is appropriate where evidence is insufficient to conclude debtor was generally not paying its debts); *In re Whiteside*, 238 B.R. 468, 471 (Bankr. W.D. Mo. 1999) (dismissing involuntary petition because with regard to the issue of whether debtor was generally paying its debts as they became due "the paucity of relevant and substantial evidence precludes us from making any meaningful determination"); *Brooklyn Resource Recovery, Inc.*, 216 B.R. at 474 (dismissing involuntary petition because petitioning creditors failed to establish debtor was generally not paying its debts as they became due).

### III.    Bad Faith Filing

VitaminSpice has requested that the Court dismiss the Involuntary Petition as a bad faith filing. The Court finds that it need not address the issue of bad faith at this juncture given that the Petitioning Creditors' failure to demonstrate that VitaminSpice was not generally paying its debts as they became due is sufficient reason to dismiss the Involuntary Petition. The Court will schedule a separate hearing to allow the parties to augment the present record with regard to the issue of whether VitaminSpice is entitled to fees and costs pursuant to 11 U.S.C. §303(i). At that time, the Court will consider the issue of bad faith as it relates to VitaminSpice's § 303(i) requests.

## SUMMARY

For the reasons discussed above, VitaminSpice's Motion to Dismiss is granted. This Court finds that, of the five Petitioning Creditors, three have met their prima facie burden of establishing that their claims are not subjected to a bona fide dispute. However, this Court finds that the Petitioning Creditors have not met their burden as to whether VitaminSpice is not paying its debts as such debts become due. For this reason, this Court is unable to order relief in this case and will dismiss the Involuntary Petition for the Petitioning Creditors' failure to comply with 11 U.S.C. § 303(h)(1). A further hearing to consider VitaminSpice's request for attorney's fees pursuant to 11 U.S.C. § 303(i) will be held.

An Order consistent with this Memorandum will be entered.


Dated: April 19, 2012

MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE